**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BENJAMIN WAI SILVA,
          *Petitioner-Appellant,*

          v.

JILL BROWN, Warden,*
          *Respondent-Appellee.*

No. 04-99000

D.C. No.
CV-90-03311-DT

OPINION

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
March 22, 2005—San Francisco, California

Filed July 26, 2005

Before: Betty B. Fletcher, Sidney R. Thomas, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge B. Fletcher

---

*Jill Brown is substituted for her predecessor, Jeanne Woodford, pursuant to Fed. R. App. P. 43(c)(2).

## COUNSEL

Phillip A. Treviño, Los Angeles, California, argued for the petitioner-appellant. With him on the briefs was Michael J. Brennan, Manhattan Beach, California.

Teresa Torreblanca, San Diego, California, argued for the respondent-appellee. Robert M. Foster, San Diego, California, was on the brief.

**OPINION**

B. FLETCHER, Circuit Judge:

The State of California charged and tried Benjamin Wai Silva for two brutal homicides, along with kidnaping, robbery, and gun offenses, but did not disclose to the defense that the plea agreement that secured the testimony of the prosecution's star witness, Norman Thomas, required Thomas not to undergo a psychiatric evaluation before testifying. As a result, the jury never learned of the considerable question as to Thomas's competence to testify or of the secret deal the Lassen County District Attorney made to ensure that question remained unanswered until after Silva was tried. At issue in this appeal is whether the failure to disclose that deal was *Brady* error. We conclude that it was.

## I. BACKGROUND

Silva's case is before us for the second time. On our first consideration of the case, we remanded for the district court to determine whether there was *Brady* error: was there a deal such as Silva alleged; if so, did the prosecutor conceal it; and if he did, were the deal and its concealment material under *Brady*? *Silva v. Woodford*, 279 F.3d 825, 855 (9th Cir. 2002) ("*Silva I*"). The district court found that there was a deal and that it was not disclosed, but found that these facts were immaterial to Silva's conviction. It is this judgment that Silva now appeals.

As the facts and procedural background are amply summarized in our prior disposition, we excerpt from that summary as relevant to the issues before us here and add additional details as necessary.

> Silva stands convicted of the gruesome abduction, robbery and murder of [Kevin] Thorpe in Madeline, California. Thorpe and his girlfriend, Laura Craig,

were college students returning from winter break when they passed through Madeline on their way to Oregon. On January 11, 1981, Silva and two accomplices, Joe Shelton and Norman Thomas, kidnaped Thorpe and Craig after spotting the couple at a filling station in town. The three men forced the couple to drive to Shelton's property and proceeded to take their cash and belongings. Thorpe was then chained to a tree while Craig was taken inside a cabin and repeatedly sexually assaulted.

*Id.* at 828.

Thorpe was subsequently shot and killed. Thomas, by his own admission, then dismembered Thorpe's body with an axe and buried the remains in shallow graves. Craig was later shot and killed by the side of a road.

Thomas informed police of the murders later that month after being found in possession of a firearm in violation of his probation. In exchange for turning state's evidence, murder charges against Thomas were dropped. He was eventually sentenced to eleven years and four months imprisonment for participating in the kidnaping, being an accessory after the fact to murder, burglary, and use of a firearm.

Shelton's trial took place before Silva's. He was convicted of murdering both Thorpe and Craig and sentenced to life without parole. On direct appeal, he was resentenced to life imprisonment.

Because of publicity, Silva's trial was held in San Bernardino County in January 1982. When called to testify at Silva's trial, Shelton invoked his Fifth Amendment privilege against self-incrimination. The primary evidence regarding Silva's role in Thorpe's death came from Thomas. Thomas testified that both

Silva and Shelton left the cabin in the morning after the kidnapings, and that Thorpe was murdered while Thomas was having consensual sex with Craig. According to Thomas, Silva then returned to the cabin and forced Thomas to dismember and dispose of Thorpe's body. Subsequently, the three men were standing over a barrel in which some of Thorpe's belongings were being burned, when Shelton allegedly proceeded to describe to Thomas how Thorpe had died. Shelton related how he and Silva had unlocked the chain linking Thorpe to the tree and led him terrified and crying up the side of a hill. After leaving briefly to obtain a weapon, Silva then walked up behind Thorpe and shot him up and down his body at close range, using an Ingram M-11 .38 caliber fully automatic pistol equipped with a silencer. Silva then gave the weapon to Shelton, who emptied the rest of the magazine clip into Thorpe's body. According to Thomas, Silva simply looked on and smiled as Shelton described the slaying to Thomas.

Thomas also testified that several days after Craig's disappearance, a similar conversation took place while the three were gathered on the porch of the cabin, in which Shelton described how Craig had been shot and killed. Once again, Silva allegedly looked on and smiled while Shelton spoke to Thomas.

At the conclusion of the guilt phase, the jury deliberated for two days before finding Silva guilty of first-degree murder in the shooting death of Thorpe. However, the jury found Silva not guilty of Craig's murder. The jury also found Silva guilty of kidnaping and robbing both victims, as well as illegally possessing a machine gun and a silencer.

*Id.* at 828-29.

At the penalty phase, the jury returned a verdict of death. Silva also received two life sentences for the two kidnaping convictions, along with a variety of lesser sentences for the other convictions. On direct appeal, the state courts substantially affirmed the verdict and the death sentence. After two state habeas petitions were summarily denied, Silva filed a federal habeas petition in 1990 and a second amended petition in 1993.

One of Silva's claims on federal habeas is that the prosecution violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose to the defense that the prosecution's deal with its chief witness Norman Thomas had required that Thomas, who had several years earlier been involved in a motorcycle accident and suffered severe brain damage, not undergo a psychiatric evaluation before testifying against Silva. Silva also claimed, among other things, that he had received ineffective assistance of counsel at the guilt and penalty phases of his trial. In 1999, the district court denied Silva's petition in its entirety.

On appeal, we affirmed the district court in part, reversed in part, and remanded. We held that relief should be granted on Silva's ineffective assistance claim with regard to the penalty phase, but we rejected Silva's claims of ineffective assistance with regard to the guilt phase. *Silva I*, 279 F.3d at 855. With respect to the *Brady* claim, we determined that Norman Thomas's credibility was "a critical issue, given that he was the only witness who could identify Silva as the trigger man in Thorpe's murder." *Id.* at 854-55. Had the prosecution's deal prohibiting a psychiatric examination of Thomas been presented to the jury, we concluded, the very fact of the deal (if true) "could by itself have undermined Thomas's credibility" by making the jury aware of "the potentially devastating fact that the state itself doubted Thomas's mental competency." *Id.* at 855. We therefore remanded the case for an eviden-

tiary hearing as to the veracity of Silva's allegations regarding the prosecution's secret deal with Norman Thomas. In accordance with our disposition of Silva's penalty phase ineffective assistance claim, we ordered that Silva be resentenced following the exhaustion of the current habeas petition. *Id.* at 856.

On remand to the district court, Silva's allegations regarding the undisclosed deal were established as true. Thomas's attorney, Rex Gay, stated in his declaration that at the time of Thomas's arraignment, he had imminent plans to have Thomas psychiatrically evaluated, because he believed Thomas "was either unable to cooperate in his own defense, or insane." Gay made his plans known to the district attorney, who agreed with Gay that Thomas's testimony would be necessary to convict Silva (and Shelton), and that having Thomas psychiatrically evaluated would "supply ammunition to the defense." Gay and the district attorney then struck a bargain under which Thomas would not be psychiatrically examined, and in return the district attorney would drop the murder charges in exchange for Thomas's testimony.

Silva's trial counsel, Thomas Buckwalter, stated in his declaration that, during his representation of Silva, he was never informed of Thomas's agreement to refrain from undergoing a psychiatric evaluation; Buckwalter did not learn of the agreement until after the trial ended. As the state submitted no evidence contradicting the Gay and Buckwalter declarations, the district court found that the evidence

> compels a finding that the prosecutor reached an agreement with Thomas prior to Silva's trial according to which Thomas would refrain from being psychiatrically examined and would testify at Silva's trial, in exchange for not being charged with murder and receiving a total sentence of not more than eleven years and four months . . . . [T]he aspect of the agreement concerning postponing any psychiat-

ric examination of Thomas was neither revealed to
the defense nor disclosed to the jury.

The district court nonetheless rejected Silva's *Brady* claim. First, the district court found that Thomas's testimony had already been adequately called into question on cross-examination because Thomas had told the jury he would be receiving a reduced sentence in exchange for his testimony, then admitted on cross-examination that murder charges could still be filed against him if he did not cooperate and that Shelton had told him to place all the blame on Silva. According to the district court, the jury's decision to acquit Silva for the murder of Laura Craig — in spite of Thomas's testimony implicating Silva for her murder as well as Kevin Thorpe's — "demonstrates that the jury did not accept all of Thomas's testimony at face value, but considered it only to the extent that it was corroborated by other evidence at trial." The district court noted the evidence corroborating significant portions of Thomas's story: in particular, the authorities found body parts and evidence of the kidnaping where Thomas said they would be, and Silva's fingerprints were found on ammunition in a trailer on the Shelton property. Finally, the district court found that Silva's vague and equivocating statements to the police after his arrest provided additional evidence of his guilt. For these reasons, the district court concluded that the prosecution's failure to disclose its agreement regarding the psychiatric examination of Thomas was not material under *Brady*. The district court therefore denied relief on this claim.

## II.  JURISDICTION AND STANDARDS OF REVIEW

This habeas petition was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Silva I*, 279 F.3d at 830, 831 n.5. A certificate of appealability is required for this appeal, but Silva's case is in all other respects governed by pre-AEDPA law. *Id.* at 831 & n.5; *accord, Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). Under pre-AEDPA standards, "state court

judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that his detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Hayes*, 399 F.3d at 978 (citation and alteration omitted).

The district court having issued a certificate of appealability, we have jurisdiction under 28 U.S.C. § 2253.

We review *Brady* claims de novo. *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004).

## III.   ANALYSIS

**[1]** The government violates its constitutional duty to disclose material exculpatory evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is "material"). *See Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (citations and internal quotation marks omitted); *see also Banks*, 540 U.S. at 699; *Strickler*, 527 U.S. at 280.

**[2]** In applying the materiality standard, the Supreme Court has explained that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Thus materiality does not require a showing that the defendant would have been acquitted had the suppressed evidence been disclosed, or that

disclosure of the suppressed evidence would have reduced the quantum of inculpatory evidence below that required to convict the defendant. *Id.* at 434-35 (stressing that materiality "is not a sufficiency of evidence test"). Rather, a *Brady* violation is established where "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

Once the materiality of the suppressed evidence is established, no further harmless error analysis is necessary, even in the context of habeas review: when the government has suppressed material evidence favorable to the defendant, the conviction must be set aside. *Kyles*, 514 U.S. at 435-36; *Hayes*, 399 F.3d at 984-85.[1]

[3] In Silva's case, the first two *Brady* elements — that the evidence is favorable to the accused and that it has been suppressed by the government — have been established. The district court found (and the State does not dispute) that the prosecution made a deal requiring that its witness Norman Thomas refrain from undergoing a psychiatric evaluation before testifying against Silva. The existence of this deal evidencing the prosecution's concern as to the mental state of Thomas was obviously impeachment evidence favorable to the defense. The deal was never disclosed to the defense. The only question the parties debate is whether it was material.

We answer this question in the affirmative. "We cannot overemphasize the importance of allowing a full and fair

---

[1]Although *Hayes* addressed claims that the prosecution violated due process by using and by failing to correct false evidence, *Hayes*, 399 F.3d at 978 (citing *Napue v. Illinois*, 360 U.S. 264 (1959), and *Alcorta v. Texas*, 355 U.S. 28 (1957)), rather than by failing to disclose material exculpatory evidence to the defense, *Hayes* is relevant to Silva's case because the same materiality analysis applies to these types of claims. *See id.* at 985 (noting that the materiality standard of *United States v. Agurs*, 427 U.S. 97 (1976), a forerunner of *Kyles*, applies to *Napue* claims); *id.* at 988 (referring to the "*Napue/Alcorta/Agurs* materiality standard").

cross-examination of government witnesses whose testimony is important to the outcome of the case." *Silva I*, 279 F.3d at 854 (quoting *United States v. Brooke*, 4 F.3d 1480, 1489 (9th Cir. 1993)). Had the full extent of the prosecution's deal with Norman Thomas been disclosed to the defense, a full cross-examination of this critical witness would have revealed that even the prosecution viewed Thomas's testimony with some doubt. The existence of the deal would have put Thomas in a different light for the jury. The legitimate question whether Thomas was competent, or perhaps insane, creates, in our minds, a reasonable probability of a different result. In the absence of disclosure of Thomas's questionable mental state to the defense and the jury, the guilty verdict returned on the murder charge is not one worthy of our confidence.

**[4]** We begin with an examination of Norman Thomas's role in Silva's trial. Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case. *See, e.g.*, *Banks*, 540 U.S. at 700 (holding that impeachment evidence was material where it pertained to a witness whose testimony was "crucial to the prosecution" and was in the prosecution's own judgment "of the utmost significance"); *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) (holding that impeachment evidence was material where it pertained to "the prosecution's star witness"); *see also East v. Johnson*, 123 F.3d 235, 239 (5th Cir. 1997) ("[W]hen the withheld evidence would seriously undermine the testimony of a key witness on an essential issue *or* there is no strong corroboration, the withheld evidence has been found to be material." (emphasis added) (citation and internal quotation marks omitted)).

**[5]** The testimony of Norman Thomas was crucial to the state's prosecution of Silva for murder. Though other evidence at trial confirmed Silva's involvement in the abduction of Thorpe and Craig and suggested Silva's recognition of his own guilt, Norman Thomas was — as both this court and the district court have previously recognized — the only witness

who provided an account of how Thorpe's murder took place and the only witness who identified Silva as his killer. *Silva I*, 279 F.3d at 852, 854-55; *see also Silva v. Calderon*, No. CV 90-3311 DT, slip op. at 10 (C.D. Cal. Jan. 27, 1999) (prior opinion of the district court, affirmed in part and reversed in part in *Silva I*) ("The most devastating evidence against Silva was Thomas's testimony informing the jury of the two tales told by Shelton and Silva's contemporaneous smile."). Thomas's testimony as to Joe Shelton's account of the events and Silva's damning response is uncorroborated anywhere else in the record. Without Thomas, the prosecution had no evidence of how — or by whom — Thorpe was killed.

Thomas's testimony was not only the prosecution's most specific evidence about the murder; it was also the most powerful. Silva's "adoptive admission" of Shelton's account of Thorpe's murder was tantamount to a confession. "As the Supreme Court has observed: 'A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " *Hayes*, 399 F.3d at 986 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)) (further citation and internal quotation marks omitted). Thus Thomas's account of the exchange between Silva and Shelton was in more than one respect the crux of the prosecution's case against Silva for Thorpe's murder. *See Silva I*, 279 F.3d at 852, 854-55. It follows that Thomas's credibility was "a critical issue." *Id.* at 854.[2]

**[6]** Had the prosecution's deal foreclosing a psychiatric examination of Thomas been revealed, it could have had a profound effect on the jury's assessment of Thomas's testi-

---

[2]Given the centrality of Thomas's testimony to the prosecution's murder case, the state's heavy reliance on *Strickler v. Greene* is misplaced. "The witness whose impeachment was at issue in *Strickler* gave testimony that was in the main cumulative, and hardly significant" to the predicate facts of the offense. *Banks*, 540 U.S. at 700 (citation omitted). The same cannot be said of Norman Thomas, without whose testimony the state would have had no evidence that Silva killed Thorpe.

mony. As we have previously recognized, evidence that calls into question a witness's competence to testify is powerful impeachment material. *See, e.g.*, *Benn v. Lambert*, 283 F.3d 1040, 1054, 1056 (9th Cir. 2002) (holding that undisclosed evidence of a crucial government witness's drug use during the defendant's trial was material because it would "reflect on [that witness's] competence and credibility as a witness"); *United States v. Service Deli, Inc.*, 151 F.3d 938, 942-44 (9th Cir. 1998) (holding that a set of handwritten notes taken by a government attorney during an interview with the government's key witness was material "most significantly" because the notes included a statement by the witness that he had sustained a stroke that affected his memory).

[7] The fact of the undisclosed deal bears critically and directly on Thomas's "competence and credibility as a witness." *See Benn*, 283 F.3d at 1056. Had the defense known that the prosecution had required, as a condition of Thomas's plea bargain, that he agree not to be psychiatrically evaluated before testifying, competent defense counsel would have ensured that the jury was "made aware of the potentially devastating fact that the state itself doubted Thomas's mental competency." *Silva I*, 279 F.3d at 855. As a result, the jury might not have believed the most important piece of Thomas's testimony — his uncorroborated account of Silva's "adoptive admission" — because of concerns about Thomas's capacity clearly to remember who said what to whom.

Such concerns would have been exacerbated by other evidence in the record that competent counsel would have brought out on cross-examination in connection with the question of Thomas's competence. In particular, Thomas's trial testimony that he was in the cabin with Laura Craig when Thorpe was killed is in conflict with Thomas's previous statement to the DA that he was with Silva when Thorpe was killed. Thomas's several admissions of confusion during his direct examination would have assumed greater importance and presumably been a subject of emphasis for the defense

had the prosecution's doubts about Thomas's mental capacity been revealed. Finally, the very fact that the prosecution had sought to keep evidence of Thomas's mental capacity away from the jury might have diminished the State's own credibility as a presenter of evidence.

**[8]** In sum, the fact of the prosecution's undisclosed deal with Thomas, had it been presented to the jury, would have put the testimony of this critical witness in a substantially different light, both directly, by casting doubt on the accuracy of Thomas's testimony, and indirectly, by inducing the defense to focus the jury's attention on Thomas's lapses and inconsistencies and by calling into question the prosecutor's faith in the competence of his own witness. With the murder prosecution so heavily dependent on Thomas's testimony, and given the powerful effect the revelation of the prosecution's own doubts about its star witness would likely have had on the jury, we cannot say that, in the absence of this evidence, Silva "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

According to the district court and the State, the impeachment of Thomas that actually occurred at trial was sufficient to render further impeachment material superfluous. Because Thomas testified that he would receive a reduced sentence for his testimony, that murder charges could still be filed against him if he did not cooperate, and that the co-conspirator Shelton had told him to place all the blame on Silva, the district court concluded that "it is not reasonably probable that such additional impeachment evidence [i.e., the undisclosed deal] would have made a difference to this jury's assessment of Silva's guilt." Along similar lines, the State urges that "since the other methods used to impeach Thomas failed, this lesser tool [i.e., the undisclosed deal] would also have failed."

**[9]** Our precedent rejects this strained logic. The failure of a defendant's efforts to impeach a witness does not prove that additional impeachment would have been ineffectual, or

merely cumulative, any more than it supports the opposite conclusion. As we explained in *Benn v. Lambert*, a defendant's conviction in spite of his attempt at impeaching a key government witness demonstrates only the inadequacy of the impeachment material *actually presented*, not that of the suppressed impeachment material; in light of the failure of the impeachment attempt at trial, the suppressed impeachment material may "take[ ] on an even greater importance." 283 F.3d at 1055; *see also Service Deli*, 151 F.3d at 944 ("It makes little sense to argue that because [the defendant] tried to impeach [the witness] and failed, any further impeachment evidence would be useless. It is more likely that [the defendant] may have failed to impeach [the witness] because the most damning impeachment evidence in fact was withheld by the government.").

In *Benn*, we held that the evidence of a witness's drug use during trial and history of misconduct was material under *Brady* even though the witness had been impeached at trial by questions about his history as a paid informant, his prior convictions, and benefits he received from the state in connection with his testimony in the case. 283 F.3d at 1054-56. The undisclosed evidence, we explained, "would have provided the defense with a new and different ground of impeachment" than those introduced at trial. *Id.* at 1056. Likewise, in *Carriger v. Stewart*, we determined that a witness's long history of burglaries and of lying to the police was material notwithstanding the jury's knowledge that the witness in question was a burglar testifying with immunity. 132 F.3d at 481-82. As we stressed there, "the government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. Rather, the government is obligated to disclose *all* material information casting a shadow on a government witness's credibility." *Id.* (citation and internal quotation marks omitted) (emphasis in original).

In Silva's case, the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but

rather was of a different kind. It "would have provided the defense with a new and different ground of impeachment." *Benn*, 283 F.3d at 1056. Thomas's admissions on cross-examination that murder charges could still be filed against him and that Shelton had instructed him to blame Silva, could cast doubt only on Thomas's forthrightness, not his competence to testify. *See Silva I*, 279 F.3d at 852. The deal regarding psychiatric evaluation, of course, relates to reliability: because of questions as to Thomas's competence, completely apart from motive, was his testimony reliable?

**[10]** We are influenced by the potency of the undisclosed impeachment material as well as its subject matter. Even though the jury heard Thomas admit to being confused several times during his direct examination, a few moments of hesitation on the part of a witness recalling year-old events pale in comparison to the fact that the party proffering the witness harbors such doubts about his competency that it has taken affirmative steps to prevent a psychiatric evaluation of that witness. *Cf. Carriger*, 132 F.3d at 481 ("[A]lthough the jury heard [the prosecution's star witness] Dunbar admit he had once slapped his stepdaughter, they heard no evidence of Dunbar's lifelong history of violence."). The fact of the undisclosed deal was not at all cumulative of the impeachment evidence Silva offered at trial; on the contrary, the fact of the prosecution's secret deal would have raised new and more powerful doubts about the reliability of Norman Thomas's testimony.

**[11]** The prosecutor's own conduct in keeping the deal secret underscores the deal's importance. While the government's *Brady* obligation exists "irrespective of the good faith or bad faith of the prosecution," *Banks*, 540 U.S. at 691 (citation and internal quotation marks omitted), we have recognized that a prosecutor's assessment of undisclosed evidence can support a finding of materiality by highlighting the importance of that evidence. For example, in *Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998), we considered the materiality of

impeachment evidence the disclosure of which the prosecutor conceded would have been "the kiss of death" to the government's case. *Id.* at 1163. We "deem[ed this] candid concession to be highly significant," because "the prosecutor, more than neutral jurists, can better perceive the weakness of the state's case." *Id.*

The prosecutor's actions can speak as loud as his words. Recently, in considering the materiality of a prosecutor's secret agreement to drop felony charges against his star witness in a capital murder trial, our en banc court found the prosecutor's furtive conduct highly relevant: "Presumably, the importance to the State's case of [the witness] James's testimony is what initially led the prosecution to make the secret deal; likewise, the importance to James's credibility of his false testimony regarding the absence of a deal is what led the prosecution to endeavor to keep that deal secret." *Hayes*, 399 F.3d at 987.

Here, Thomas's attorney Rex Gay declared in his uncontroverted affidavit that the prosecutor agreed with Gay's assessment that a psychiatric evaluation of Thomas could be damaging to the State's case against Silva. The prosecutor took his concern one step further, concluding that the very fact of the deal regarding Thomas's psychiatric evaluation needed to be concealed from the jury. The State's deliberate and strategic decision to make the deal and not to disclose it suggests the weakness of its post hoc claims that the evidence was irrelevant.

The State makes much of the fact that the jury did not find Silva guilty of Laura Craig's murder despite having heard Thomas finger Silva as her killer in exactly the same manner he implicated Silva in Kevin Thorpe's death: by relating Silva's reaction to a tale told by Shelton. According to the district court and the State, the fact that the jury acquitted Silva on Craig's murder despite convicting Silva for Thorpe's murder demonstrates that the jury credited Thomas's testimony

only where it was corroborated by other evidence. On this theory, additional impeachment of Thomas would not have shaken the guilty verdict on Thorpe's murder because the jury must have considered Thomas's story about Thorpe's death to have been corroborated more strongly than Thomas's story about Craig's death.

**[12]** The problem with this interpretation is that Thomas's testimony was the only evidence of Silva's role in Thorpe's murder. Because Thomas's account of Thorpe's death is no more strongly corroborated in the record than Thomas's claim that Silva killed Craig, an equally plausible interpretation of the split verdict is that the jury entertained some doubts about Thomas's credibility and so did not believe everything Thomas told them. If the jury had been presented with evidence of the prosecution's own doubts as to Thomas's mental capacity, the jury might not have believed Thomas's account with regard to either murder. Thus the fact that the jury acquitted Silva of the Craig murder proves little about the materiality of the secret deal to Silva's conviction for the Thorpe murder.

Finally, the State claims that the undisclosed deal with Thomas cannot be deemed material under *Brady* because it would not have been admissible in court. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam). The State's premise is simply incorrect. Whether or not it is true (as the State claims) that California law would not have allowed Silva to force a psychiatric evaluation of Thomas and would have protected as attorney work-product the district attorney's doubts about Thomas's credibility, it is clear that *the fact of the deal itself* would have been admissible to impeach Thomas by calling into question his capacity as a witness and by illustrating the full extent of the agreement that provided a motive for Thomas to testify. *See* Cal. Evid. Code. § 780(c), (f) ("[T]he court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the

hearing, including . . . [t]he extent of his capacity to perceive, to recollect, or to communicate any matter about which he testifies [and] . . . [t]he existence or nonexistence of a bias, interest, or other motive. . . .”). The State’s admissibility objection under *Wood* thus dissolves: the fact of the deal could have been presented to the jury, and — as our analysis has demonstrated — this evidence was material in and of itself.

**[13]** In sum, because evidence of the undisclosed deal could well have undermined the credibility of a vital prosecution witness, “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” *Kyles*, 514 U.S. at 433 (citations and internal quotation marks omitted). Therefore, the prosecution’s secret deal with Thomas was material to Silva’s conviction for murder, and the State violated Silva’s due process rights by failing to disclose the deal to the defense.

On appeal, Silva understandably focuses on the effect of the undisclosed deal on his murder conviction. The strong evidence in the record corroborating the parts of Thomas’s account relevant to the kidnaping, robbery, and firearms charges precludes reversal of Silva’s convictions on these charges.

## IV.  CONCLUSION

In our justice system, the prosecuting attorney occupies a special position of public trust. Courts, citizens, and even criminal defendants must rely on these public servants to be honorable advocates both for the community on whose behalf they litigate and for the justice system of which they are an integral part. When prosecutors betray their solemn obligations and abuse the immense power they hold, the fairness of our entire system of justice is called into doubt and public confidence in it is undermined.

The evidence in this case leaves no doubt that Silva was involved in the sordid conduct that led to the deaths of Kevin Thorpe and Laura Craig. Unfortunately, the reliability of the jury's verdict as to Silva's role as the triggerman in Thorpe's murder was compromised by the Lassen County District Attorney's unscrupulous decision to keep secret the deal he made to prevent an evaluation of the competence of the State's star witness. The particularly atrocious nature of the crimes with which Silva was charged cannot diminish the prosecutor's — and our court's — duty to ensure that all persons accused of crimes receive due process of law.

**[14]** We reverse the judgment of the district court and remand with instructions to grant the writ of habeas corpus with respect to Silva's murder conviction, and we reaffirm the vacation of his sentence in accordance with our disposition in *Silva I*, 279 F.3d at 856. We leave Silva's convictions on the kidnaping, robbery, and firearms charges undisturbed. The State shall retry Silva within a reasonable time or resentence him based on these remaining convictions.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**