**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOSEPH P. SHELTON, *Petitioner*, v. JOHN C. MARSHALL; ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, *Respondents-Appellees*. | No. 13-15707 D.C. No. 4:10-cv-01100-PJH OPINION |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, Chief District Judge, Presiding

Argued and Submitted November 20, 2014
Submission Vacated November 25, 2014
Submitted August 7, 2015
San Francisco, California

Filed August 7, 2015

Before: Sidney R. Thomas, Chief Judge and Stephen
Reinhardt and Morgan Christen, Circuit Judges.

Opinion by Judge Reinhardt

# SUMMARY[*]

## Habeas Corpus

The panel reversed in part and affirmed in part the district court's denial of California state prisoner Joseph Shelton's habeas corpus petition challenging his convictions for the first-degree murder of Kevin Thorpe, the second-degree murder of Laura Craig, kidnapping, and theft.

The panel held that the prosecution's suppression of a material part of its deal with key witness Norman Thomas violated *Brady v. Maryland* with respect to Shelton's conviction for the first-degree murder of Thorpe, and ordered the writ granted as to that conviction. The panel explained that Thomas's testimony was central to the prosecution's case that Shelton premeditated and deliberated regarding Thorpe's murder, and held that there is a reasonable probability that had the jury known of the prosecution's serious doubts as to Thomas's mental competence and of its successful efforts to prevent him from obtaining a competency test until after he testified, it would have reached a different result on that count. The panel concluded, in a memorandum disposition, that had Thomas been impeached by evidence of the secret deal with the prosecution regarding his competency, there is not a reasonable probability that the jury would have reached a different result with respect to Shelton's convictions for the second-degree murder of Craig, kidnapping, and theft.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

William L. Osterhoudt (argued) and Dolores T. Osterhoudt, Law Offices of William L. Osterhoudt, San Francisco, California, for Petitioner-Appellant.

Peggy S. Ruffra (argued), Supervising Deputy Attorney General; Kamala Harris, Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Gerald A. Engler, Senior Assistant Attorney General; Christopher J. Wei, Deputy Attorney General, San Francisco, California, for Respondent-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

Joseph Shelton, who is serving 40 years to life for the brutal kidnapping and murder of Kevin Thorpe and Laura Craig in 1981, appeals from the denial of his petition for a writ of habeas corpus. We hold that the prosecution's suppression of a material part of its deal with a key witness, Norman Thomas, violated *Brady v. Maryland*, 373 U.S. 83 (1963), with respect to Shelton's conviction for the first-degree murder of Thorpe and order the writ granted as to that conviction. Thomas's testimony was central to the prosecution's case that Shelton premeditated and deliberated regarding Thorpe's murder, and there is accordingly a reasonable probability that had the jury known of the prosecution's serious doubts as to Thomas's mental competence and of its successful efforts to prevent him from obtaining a competency test until after he testified, it would have reached a different result on that count. We conclude,

however, in a memorandum disposition filed along with this opinion that, had Thomas been impeached by evidence of the secret deal with the prosecution regarding his competency, there is not a reasonable probability that the jury would have reached a different result with respect to Shelton's convictions for the second-degree murder of Craig, kidnapping, and theft. Thus, we affirm as to those counts.

## I. Background

### A.  The offenses and trials

Shelton stands convicted of the first-degree murder of Thorpe, the second-degree murder of Craig, two counts of kidnapping, two counts of theft, and two weapons charges. Most of the basic facts are undisputed. On January 11, 1981, Thorpe and Craig were driving through Madeline, California on the way to college when Shelton, Thomas, and Benjamin Silva spotted them at a gas station and subsequently abducted them. The three men took the couple to Shelton's cabin, where Thorpe was chained to a tree while Craig was held inside.

The next day, Thorpe was shot to death with a machine gun. At Silva's direction, Thomas dismembered Thorpe's body and the two men disposed of it in a remote location. Craig was murdered on the side of the road a few days later. She had been shot twice.

Thomas was subsequently arrested for a probation violation. While in custody, Thomas told the police about the murders and directed them to Thorpe's remains and other physical evidence of the crimes. Shelton turned himself in shortly thereafter, waived his rights, and gave a series of

partially inculpatory though sometimes inconsistent statements to the police. He also led them to Craig's remains.

At Shelton's trial, the State's evidence consisted primarily of Thomas's testimony, Shelton's own statements to investigators, and a series of notes passed between Shelton and Thomas while the two were in jail.[1] The defense case consisted of Shelton's testimony that he had been present during the crimes but that he was intoxicated on various drugs and alcohol, did not willingly participate, and feared that if he resisted or tried to leave, Silva would kill him and his family.[2] There was thus no dispute that Shelton was at least present for all of the crimes. At issue with respect to Thorpe's murder—the only question we deal with in this opinion—is the degree of Shelton's participation and whether he possessed the requisite *mens rea*, i.e, whether he "deliberated and premeditated" as required by California law for a conviction of first-degree murder. *See infra* note 13.

At trial, Thomas and Shelton testified to different versions of the crimes. In both versions, Silva was the primary instigator. Their testimony differed greatly, however,

---

[1] The jury also heard testimony about the scene of the crimes, the condition of the bodies, the property of the victims that was recovered, the weapons and other items found in the cabin and the surrounding area, and the local geography. None of this evidence conveyed anything about Shelton's particular role in the crimes, with the exception of testimony that Shelton's fingerprints were found on a car stereo taken from the victims' car and on sundry items in the cabin, and that he was wearing Thorpe's boots when he turned himself in. None of this testimony shed any light on the question whether Shelton was guilty of *first-degree* deliberate and premeditated murder.

[2] At the time of the crimes, Silva was a Hell's Angel and a fugitive. Shelton and Thomas's relationships to the Angels was less clear.

regarding the degree of Shelton's participation. According to Shelton, when Silva spotted the couple at the gas station and proposed kidnapping them, Shelton said that he "didn't want no part of it." He initially denied that the men had discussed kidnapping and killing people before they saw Thorpe and Craig, but when his recollection was refreshed with a copy of a statement he gave to an investigator the day after he turned himself in, he admitted that the three men had discussed kidnapping a girl a few weeks before the crimes.

A few miles past the gas station, Silva used a red light to pull the couple's car over. Shelton testified that he was with Silva when he purchased a light like the one used, but that it was purchased for an unrelated prank and he never held it during the kidnapping. Once the victims' car stopped, Silva and Thomas ran up to it, entered it, and abducted the couple at gunpoint. Shelton remained in the truck in which the three men had arrived and followed the couple's car to his cabin; he testified that he did not drive off because he believed that "Silva would have killed me. . . . He would have killed my family." When they arrived at Shelton's property, Silva told Craig and Thorpe to get on the back of the truck, which Shelton then drove to the cabin. Shelton then remained at the cabin with Craig, Thorpe, and Silva, while Thomas left for a short period. When Thomas returned, he and Silva took Thorpe outside, and he later told Shelton that they had chained Thorpe to a tree. Silva and Thomas then left until morning. While they were gone, Shelton gave Thorpe a sleeping bag.

Shelton testified that after Silva and Thomas returned the next day, Silva "said he was moving [Thorpe] because he could be seen from the road." Shelton, who said that he believed that he was unarmed, stated that he then walked with

Thorpe, who was still chained, up a hill, while "[Silva] took off . . . to get . . . some more chain and stuff." Shelton denied knowing that Thorpe was being taken up the hill to be killed, and said that he did not speak to Thorpe while they waited "not [a] very long" time before Silva returned. Shelton testified that when Silva returned, he "heard a click and . . . turned around and [Silva] was standing there with a machine gun;" Shelton said he was halfway between Silva and Thorpe and "jumped behind a tree when the bullets started flying." After Silva emptied a clip (thirty bullets) into Thorpe, Shelton said that Thorpe fell to the ground, and then Silva fired half of another clip into him. According to Shelton, Silva then "gave [Shelton] the gun and said shoot him." Shelton admitted that he then fired the rest of the clip at Thorpe, but stated that he didn't think that he hit him and that he "wasn't aiming at him." He said that although he had previously told police that he hit Thorpe in the eye, "that was something that stuck in my mind from something else." Shelton stated that if he hadn't shot at Thorpe, Silva would have killed him "the second I said no."

Shelton testified that in the days following Thorpe's murder, he tried to protect Craig from Silva. He said that at one point he left the cabin with her and that they ran across a meadow and over a hill "when [Silva] caught us." He also stated that he thought that he could talk Silva out of killing Craig, that at one point he had in fact talked Silva out of killing her, that Craig liked Shelton more than the others and was not afraid of him, and that she could have left at any time. He denied knowing that she would be killed when he and Silva left the cabin with her, purportedly to take her to see the head of the Hell's Angels. Shelton stated that Silva stopped along the way to buy Craig a Pepsi and that Silva was very calm, leading him to believe that he would not shoot her.

Silva later stopped the truck to change drivers but then suddenly shot Craig as he rounded the vehicle. Finally, Shelton testified that he was on speed, "reds, valium, and pot" the night of the kidnapping but that he was not intoxicated when Craig was killed.

Thomas's testimony about Shelton's role in the crimes differed considerably. In his account, none of the men consumed any alcohol or drugs during the course of the criminal activities. According to Thomas, Shelton and Silva had discussed kidnapping people prior to the crimes and said that if they did so, they would have to kill them. At the Madeline gas station, Silva said he "wanted" Craig, and Shelton remarked that she was pretty. Just prior to the kidnapping, Thomas and Shelton swapped positions in the truck after Shelton declined to do the kidnapping because he was too well known in the area.

Thomas testified that it was Shelton and Silva who chained Thorpe to the tree outside of the cabin, that it was Thomas who gave him a sleeping bag, and that Shelton became upset when Craig was left unguarded. With respect to Thorpe's murder, Thomas testified that Shelton was armed when he left with Silva and Thorpe to go up the hill, that Shelton returned and told Thomas to turn on the stereo, and that Silva later returned and told him to turn up the volume—the inference being that they wanted to mask the sound of gunfire.

According to Thomas, Shelton later confessed his role in Thorpe's murder to Thomas, stating that he had watched Thorpe while Silva went to get a machine gun; that Thorpe cried and asked to be unchained; and that while waiting for Silva, Shelton told Thorpe "to look at the mountain, because

it was the last thing he would see." Thomas also said that Shelton told him that Thorpe's arm was reaching up after Silva emptied the first clip into him, that Silva then shot him again, and that then "[Shelton] took the machine gun and shot the guy all over again." Finally, Thomas testified that Shelton laughed as he recounted the murder to him.

The jury also heard testimony regarding incriminating statements that Shelton made to various law enforcement officials after turning himself in, both via the reading of transcripts and officer testimony.[3] In interviews on January 31, 1981 and February 1, 1981, Shelton professed to have been intoxicated during the kidnapping, yet recounted details of the events, including that the men discussed kidnapping a female before the abduction. According to this testimony, he also stated that he was armed during the initial kidnapping, that he had sex with Craig in the cabin but that, unlike when Silva and Thomas had sex with her, his sexual acts were not forcible.[4]

During the initial interviews on January 31 and February 1, Shelton claimed that he was not present for Thorpe's murder and that he learned about it from Thomas. A sergeant

---

[3] The jury heard (or was read): (1) a transcript of an interview on January 31, 1981; (2) testimony from Sergeant Coulter of the Shasta County Sheriff's Office about interviews on February 1, 1981 and February 2, 1981; (3) a transcript of an interview on February 2, 1981; and (4) testimony from an investigator for the California Department of Justice about an unrecorded interview with Shelton on February 3, 1981.

[4] On January 31, Shelton stated in a recorded interview that he was "always armed" during this period in which the crimes took place. On February 3, he said he might have been armed during the kidnapping but wasn't sure.

testified that Shelton stated that while he was inside the cabin with Craig, "Mr. Thomas and Silva came in and told him to turn the music up on the stereo. And a little later they came back and told him to turn it up a little louder." The sergeant also testified that Shelton said that before Silva and he left the cabin with Craig, Silva told him he was going to kill her with a baseball bat, and that Shelton "indicate[d] that he didn't believe she had any chance to escape or leave." Shelton's account of Craig's murder was otherwise consistent with his account on the stand—that Silva stopped the car to switch drivers, but then, without any indication of his intent to do so, suddenly shot Craig.

Shelton's story regarding Thorpe's murder changed during interviews on February 2. He first denied being present during Thorpe's killing. Later, in interviews on that day and the next, however, he admitted being present and recounted the Thorpe killing consistently with his trial testimony, except that he said nothing about what he thought Silva was planning to do (either when they went up the hill or when Silva left him with Thorpe) and he admitted that he "might have" been armed at the time but wasn't sure. In these interviews, Shelton never gave any indication that he knew in advance that Silva was planning to shoot Thorpe. At trial, Shelton claimed that his story had changed from the initial interviews because he had tried to block out the Thorpe murder.

During an interview on February 2, Shelton said that the reason he at one point took Craig across a meadow and over a hill was that he thought the Hell's Angels were coming and that he and Silva "hadn't come to an agreement yet as to what was going to happen to her." He explained that they might

make her "a prostitute, x-rated movie maker, club pass-around" or someone's "old lady."

An investigator with the California Department of Justice testified, on the basis of the only unrecorded interview, that on February 3, 1981, Shelton stated that prior to the kidnapping, "there had been a conversation that if in fact [a] kidnapping were to take place that they might have to kill the victims"; that "Mr. Silva spoke of it on numerous occasions"; and that Silva and Shelton had purchased the red light in preparation for committing a kidnapping. The investigator also testified that Shelton told him that when he and Silva left the cabin with Craig, he was convinced that she would be murdered—about 90% sure—but "felt by his being present perhaps somewhat he could intercede and save her." Shelton's statements on February 2 and 3 regarding Craig's murder were otherwise the same as at trial.

The prosecution also introduced into evidence several notes that Shelton wrote to Thomas while the two were in jail subsequent to Shelton learning that Thomas was cooperating with the prosecution and subsequent to all of Shelton's inculpatory statements to the police. The notes have no bearing on the issue in this appeal, as they did not discuss Thorpe's murder or contain evidence of premeditation or deliberation.[5]

---

[5] For example, in one note Shelton told Thomas to tell his lawyer that he decided to tell the truth because "Joe almost died last night, and was refused medical attention, and you felt sorry for me." In another note, he told Thomas that "if the lawyer can't get you off, I'll break you out." He also said that Thomas should testify that Shelton received a ride from an old cowboy after they saw the couple at the gas station and was not seen again until the crimes were over. A third note told Thomas to start attending bible study because it would help their case.

On November 17, 1981, after deliberating for two and a half days, the jury convicted Shelton of the first-degree murder of Thorpe, the second-degree murder of Craig, two counts of kidnapping, two counts of theft, possession of a machine gun, possession of a silencer, and one special circumstance with respect to the Thorpe murder, making Shelton eligible for the death penalty. Significantly, the verdict reflects that the jury acquitted Shelton of the charge of *first-degree* murder of Craig. After the jury declined to impose a capital sentence for Thorpe's murder,  the court sentenced Shelton to life without parole on that charge and fifteen years to life for Craig's murder in the second degree to be served consecutively.  It stayed its sentences with respect to the other counts. On June 27, 1984, the California Court of Appeal affirmed the judgment but struck the special circumstance in an unpublished opinion. Shelton was then resentenced to twenty-five years to life for the murder of Thorpe.

Silva was tried after Shelton in January 1982. Thomas was again the principal prosecution witness. Shelton was called to testify, but invoked his Fifth Amendment privilege against self-incrimination. *See Silva v. Woodford* ("*Silva I*"), 279 F.3d 825, 828 (9th Cir. 2002). Silva was convicted of the first-degree murder of Thorpe, the kidnapping and theft of both Thorpe and Craig, and possession of a machine gun and silencer. *Id.* at 829. He was acquitted, however, of the murder of Craig. He was then sentenced to death for the murder of Thorpe. *Id.*

## B.  The prosecution's secret deal with Thomas

In 1986, Silva's counsel learned that before Shelton's and Silva's trials, Thomas's attorney, Rex Gay, approached

Lassen County District Attorney Paul DePasquale, the prosecutor in both cases, and "indicated . . . that [Gay] believed that Mr. Thomas was either unable to cooperate in his own defense, or insane." Prior to this, Gay had also obtained a protective order prohibiting the undersheriff from speaking with Thomas "based on the belief that he was incapable of understanding [his] rights." Prior to the crimes, Thomas had suffered a severe motorcycle accident resulting in an extended coma, and Gay "noted a certain slowness in his mannerisms and a defect in his speech pattern." Gay told DePasquale that he "had immediate plans to have [Thomas] interviewed by two psychiatrists."

DePasquale agreed with Gay that he would be unable to obtain a conviction of either Silva or Shelton without Thomas's cooperation. DePasquale and Gay also agreed that a psychiatric analysis of Thomas would "supply ammunition to the defense." They then reached a plea agreement in which Gay would refrain from having Thomas psychiatrically examined, Thomas would testify against Shelton and Silva, and DePasquale would drop murder charges against Thomas. The portion of the deal pertaining to Thomas's mental competency was not disclosed to either Shelton or Silva. Indeed, Shelton first learned about it when he read this Court's 2005 decision granting habeas relief to Silva.

## C. Subsequent procedural history

In 2002, this Court, through a different panel of judges, granted Silva's habeas claim for penalty-phase ineffective assistance of counsel and remanded for an evidentiary hearing on a *Brady* claim based on the prosecution's failure to disclose the portion of the deal with Thomas relating to

Thomas's not undergoing a psychiatric examination.[6] *Id.* at 855–56. On remand, the district court found that the prosecution had indeed made the secret deal but held that it was not material to the convictions (or the penalty). *See* Order Denying Claim D, *Silva v. Woodford*, No. 2:90-cv-03311-DT (C.D. Cal. Dec. 22, 2003), ECF no. 200, at 9–15; *see also Silva v. Brown* ("*Silva II*"), 416 F.3d 980, 984–85 (9th Cir. 2005). In 2005, the same panel of judges of this Court reversed in part and ordered that the writ be granted as to Silva's conviction for the murder of Thorpe, but affirmed the denial of relief as to the kidnapping, robbery, and firearms convictions. *Silva II*, 416 F.3d at 992.

On November 8, 1991, Shelton filed his first federal petition alleging that a post-arrest statement was unlawfully obtained and that the trial court erred by failing to instruct the jury on diminished capacity. This first petition was denied by the district court but never considered on the merits by this Court.[7]

Although Silva filed a state habeas petition in 1989 based on the same underlying facts as the instant *Brady* claim, Shelton did not learn of the matter until he discovered, in the prison law library, this Court's 2005 opinion granting relief to Silva. On May 4, 2006, Shelton presented the instant *Brady*

---

[6] Silva's filed his habeas petition prior to AEDPA's effective date. *Silva I*, 279 F.3d at 831 & n.5.

[7] On December 16, 1992, Shelton's first federal petition was denied in full by the district court. On December 15, 1993, this Court declined to consider the merits of the petition because Shelton failed to file a Notice of Appeal with respect to the December 1992 order, although he had filed a Notice of Appeal with respect to a November 1992 order in which the district court denied the petition in part and stayed it in part.

claim to the California Superior Court, which denied relief in a written decision on August 24, 2006 stating that the secret agreement did not concern evidence that was "favorable to petitioner." The California Court of Appeal summarily denied relief on November 30, 2006, as did the Supreme Court of California on June 13, 2007.

Shelton filed a second federal petition raising his *Brady* claim on June 25, 2007. After the district court dismissed the petition as second and successive, this Court granted authorization to file a second petition on November 4, 2008 on the ground that the prosecution's deal with Thomas constituted newly discovered evidence. Shelton filed his second petition on December 17, 2008. On April 8, 2013, the district court denied the petition but granted a certificate of appealability as to the materiality of the prosecution's undisclosed agreement with Thomas. Shelton appeals.

## II. Analysis

### A. Standard of Review

Shelton's habeas petition raising the instant *Brady* claim was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA therefore applies to Shelton's claim, although it was inapplicable in Silva's case.[8] Under AEDPA, a federal court

---

[8] Shelton did not learn of the prosecution's bargain with Thomas that he would not submit to mental examination before Shelton's trial until some time following this Court's issuance of its decision in Silva's case in 2005. He asks the panel to toll the application of AEDPA based on the State's misconduct in failing to advise him of its deal with Thomas even after it began litigating an essentially identical *Brady* claim in Silva's case—as early as 1989. We do not reach that issue in light of our holding below.

may not grant the writ based on a claim adjudicated on the merits by a state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The district court's denial of the writ is reviewed *de novo*. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004).

## B.  Application of AEDPA

There are three distinct elements of a *Brady* violation: First, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Second, "that evidence must have been suppressed by the State, either willfully or inadvertently." *Id.* at 282. Third, "prejudice must have ensued." *Id.*[9] The decision of the California Superior Court was the last reasoned state court decision in this case and is accordingly the subject of our review.[10] In that decision, the court ruled only on the first element of Shelton's claim—whether the suppressed evidence was favorable to Shelton.

---

[9] The terms "prejudice" and "materiality" are used interchangeably. *See, e.g.*, *Silva II*, 416 F.3d at 985.

[10] Where a state court of last resort issues a postcard denial of a habeas petition, the federal court "looks through" the summary denial and considers the last reasoned decision by a state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); s*ee also Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).

The California Superior Court's denial of Shelton's habeas corpus petition on the ground that "it is difficult to conclude that anything favorable to petitioner was suppressed" is contrary to clearly established law, as determined by the Supreme Court. Evidence that the prosecution believed Thomas to be incompetent was powerful fodder for impeaching his testimony against Shelton. *See Silva II*, 416 F.3d at 987. The State does not dispute that impeachment evidence, like exculpatory evidence, plainly constitutes evidence that is favorable to the accused under *Brady*'s first prong. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule. Such evidence is 'evidence favorable to an accused . . . .'" (citations omitted)).[11] We hold that under clearly established Supreme Court precedent, Shelton satisfies the "evidence favorable to the accused" element of *Brady* error. As to the second element, the State concedes that it made a deal with Thomas requiring that his competency not be examined prior to his testimony against Shelton, and that it failed to disclose the deal to the defense.

No state court decision has addressed the third element of Shelton's *Brady* claim—whether the suppression of the impeachment evidence prejudiced him, i.e., was "material." The district court applied AEDPA deference in its review of the materiality of the suppressed evidence because it believed

---

[11] *See also Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("Farr's paid informant status, qualifies as evidence advantageous to Banks."); *Strickler*, 527 U.S. at 280 ("We have . . . held that the duty to disclose . . . encompasses impeachment evidence as well as exculpatory evidence." (citation omitted)); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding "nondisclosure of evidence affecting credibility falls within" the *Brady* rule).

that the state court meant "material" when it said "favorable." We will not read the state court opinion as meaning something other than what it plainly said. We accordingly examine the materiality question *de novo. See Porter v. McCollum*, 558 U.S. 30, 38–39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003); s*ee also Amado v. Gonzalez*, 758 F.3d 1119, 1131, 1136–38 (9th Cir. 2014).

## C. Materiality

"[The] touchstone of materiality is a 'reasonable probability' of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The relevant question is whether "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). The omitted evidence "must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976).[12]

Thomas provided "the glue that held the prosecution's case [for the first-degree murder of Thorpe] together." *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005). His "testimony was the only direct evidence establishing that [Shelton] had a premeditated plan to kill" or that he deliberated—the key issue with respect to whether he was guilty of first-degree, rather than second-degree, murder. *Gonzalez v. Wong*,

---

[12] Once prejudice is shown under this standard, further harmless-error review does not apply. *See Kyles*, 514 U.S. at 435.

667 F.3d 965, 986 (9th Cir. 2011).[13] The district court appreciated that there exists a "reasonable probability of a different result" where, had the suppressed evidence been disclosed, the defendant might well have been convicted of a different offense or a different degree of the crime. *Kyles*, 514 U.S. at 434. That is, a probability of a total acquittal is not required to establish prejudice.

We conclude that had Thomas's testimony against Shelton been excluded as a result of the prosecution's secret efforts to preclude an inquiry into his competency, there is a reasonable probability that the jury would not have found Shelton guilty of deliberate and premeditated first-degree murder—that the outcome of the proceeding would have been different. Certainly, viewing the record as a whole we cannot be confident that the verdict would have been the same. We

---

[13] The jury was instructed that first-degree murder was either: (1) "murder which occurs during the commission or attempt to commit the crime of robbery," or (2) "murder which is perpetrated by any kind of willful, deliberate and premeditated killing." The verdict reflects that the jury convicted Shelton of the first-degree murder of Thorpe based on the latter theory and rejected the former.

Although we hold in a memorandum disposition filed concurrently with this opinion that the evidence, apart from Thomas's testimony regarding Shelton's intentional participation in the kidnapping of Thorpe and Craig, precludes a finding of a reasonable probability of a different outcome on the kidnapping counts, at the time of trial kidnapping was not a predicate offense for first-degree felony murder. Rather, murder occurring in the course of a kidnapping was punishable as second-degree murder only. *See* Cal. Penal Code § 189 (West 1970 & Supp. 1988). In 1990, Proposition 115 amended section 189 to include kidnapping as a predicate offense for first-degree felony murder. *See* Cal. Penal Code § 189 (West Supp. 1999) ("Historical and Statutory Notes"); *People v. Davis*, 896 P.2d 119, 146 & n.11 (Cal. 1995). The amendment did not apply retroactively, however. *See id.*

do not rely on the possibility that Thomas's testimony was excludable, however, as we also hold that there was a reasonable probability of a different outcome had Thomas's testimony been admitted and then impeached by evidence of the prosecution's undisclosed deal with him.

> We cannot overemphasize the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case. Had the full extent of the prosecution's deal with Norman Thomas been disclosed to the defense, a full cross-examination of this critical witness would have revealed that even the prosecution viewed Thomas's testimony with some doubt.

*Silva II*, 416 F.3d at 986–87 (internal citations and quotation marks omitted).

Shelton and Thomas gave very different accounts of Thorpe's murder and Shelton's role in it, with Shelton asserting that he was surprised and even endangered by Silva's actions, while Thomas claimed that Shelton clearly knew what was about to happen to Thorpe and indeed actively and eagerly played a part in it. According to Shelton, (1) he thought that he was taking Thorpe up the hill in order to conceal him and that Silva went to get more chains; (2) he did not know that Thorpe would be killed; (3) he was surprised when Silva opened fire on Thorpe and had to jump out of harm's way himself; and (4) he shot at Thorpe only after Silva had already felled him with forty-five bullets (a clip and a half) and only because he believed that Silva would shoot him on the spot if he did not comply with his order. By

contrast, Thomas testified that (1) Shelton guarded Thorpe knowing that Silva was going to retrieve a machine gun; (2) Shelton returned from the hill in order to turn up the stereo—indicating that he knew in advance that Thorpe would be shot and tried to conceal the sound; (3) while waiting for Silva's return, Shelton told Thorpe to "look at the mountain, because it was the last thing he would see"; and (4) Shelton laughed while recounting Thorpe's murder. Thomas also described Shelton as *taking* the gun from Silva in order to shoot Thorpe, rather than being ordered to do so or risk being shot himself.

No other evidence corroborated this account by Thomas of Shelton deliberating and premeditating the killing of Thorpe—not Shelton's statements to investigators, his trial testimony, the notes he passed to Thomas in jail, or any physical or forensic evidence. "[I]t was [Thomas's tainted testimony alone] that revealed that [Shelton] confessed" *to knowing in advance* that Thorpe would be killed and *to participating willingly* in his execution, *Horton*, 408 F.3d at 579—by far the most damning evidence heard by the jury, *see Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

The materiality of evidence "is best understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444; *see also Banks v. Dretke*, 540 U.S. 676, 700 (2004); *Horton*, 408 F.3d at 579. In his closing argument, DePasquale emphasized the "look at the mountain" statement, arguing that it demonstrated that Thorpe never had a chance to survive. Moreover, in entering the judgment, the trial judge cited "the transactions . . . of turning up the hi-fi or this loud speaker" as the basis of the first-degree conviction because it demonstrated that "Shelton had advance knowledge of the plan involving Thorpe" and that "the purpose of the mission

at the time [was] the execution of Thorpe." This evidence that the prosecutor and the district judge found central to the first-degree conviction came solely from Thomas—a witness whose testimony even the prosecution seriously doubted and whom it precluded from obtaining a competency examination.

In *Silva II*, this Court explained why the very deal at issue in this case, had it not been illegally suppressed, would have severely undermined the State's case and created "a reasonable probability of a different result":

> Had the prosecution's deal foreclosing a psychiatric examination of Thomas been revealed, it could have had a profound effect on the jury's assessment of Thomas's testimony. . . . The fact of the undisclosed deal bears critically and directly on Thomas's competence and credibility as a witness. Had the defense known that the prosecution had required, as a condition of Thomas's plea bargain, that he agree not to be psychiatrically evaluated before testifying, competent defense counsel would have ensured that the jury was made aware of the potentially devastating fact that the state itself doubted Thomas's mental competency. . . . [T]he very fact that the prosecution had sought to keep evidence of Thomas's mental capacity away from the jury might have diminished the State's own credibility as a presenter of evidence.

> In sum, the fact of the prosecution's undisclosed deal with Thomas, had it been

>presented to the jury, would have put the testimony of this critical witness in a substantially different light, both directly, by casting doubt on the accuracy of Thomas's testimony, and indirectly, by inducing the defense to focus the jury's attention on Thomas's lapses and inconsistencies and by calling into question the prosecutor's faith in the competence of his own witness.

*Silva II*, 416 F.3d at 987–88 (citations and internal quotation marks omitted).

The district court nonetheless believed that the suppressed evidence was not material because of Shelton's statements "that he accompanied Silva in walking Thorpe up the hill, guarded Thorpe in Silva's absence, . . . jumped behind a tree to avoid being shot . . . [, and] admitted that he shot Thorpe with Silva's machine gun after Silva fired one and a half clips into the victim." While these statements provide corroboration of Shelton's participation in Thorpe's murder such that even a jury informed of the deal with Thomas might well have found Shelton guilty of *second-degree* murder—that is, murder in the course of a kidnapping—they are fully consistent with and simply form a part of Shelton's explanation that he was not aware in advance of what was about to happen to Thorpe and thought that he was helping move him to a location out of the public view. Thus, the statements viewed in context provide little if any evidence as to the premeditation or deliberation required for a first-degree conviction. *See supra* note 13. Indeed, Shelton's testimony that he had to jump out of the line of fire, if credited, would be evidence that he was surprised by Silva's conduct, and the fact that Shelton told the investigators that, in fear for his own

life, he fired at Thorpe after Silva had already shot him forty-five times does not indicate premeditation and deliberation. Had defense counsel been able to cross-examine Thomas thoroughly about the deal's requirement that he not receive a psychiatric examination before testifying and explain to the jury that even the prosecution was concerned about his mental stability, if not his sanity, there is a reasonable probability that the jury would not have reached the verdict it did. Certainly, as Thomas's evidence was the primary evidence upon which the prosecution relied to establish premeditation and deliberation, we cannot say with confidence that had his testimony been impeached on the ground of his potential mental incapacity or insanity and the prosecution's unlawful deal to keep that information from the jury, the jury would have nevertheless returned a verdict of first-degree rather than second-degree murder.

True, Shelton's admissions that he was present for Thorpe's killing, watched Thorpe while waiting for Silva, and shot at his body after Silva already had fired forty-five rounds into him, if taken in isolation, could constitute *circumstantial* evidence that he knew in advance that Thorpe would be killed. Nevertheless, we have held that prejudice is established where the concealed evidence would impeach the only witness to provide direct evidence of the defendant's *mens rea*. *See Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc) (finding suppressed evidence material where tainted witness's testimony "was the centerpiece of the prosecution's case" and "[n]early all of the other evidence against Hayes was circumstantial."); *see also Gonzalez*, 667 F.3d at 986; *Horton*, 408 F.3d at 580; *Benn v. Lambert*, 283 F.3d 1040, 1062 (9th Cir. 2002). We repeat: Thomas's testimony supplied the only direct evidence that Shelton deliberated and premeditated Thorpe's murder, as opposed to

acting on Silva's command and in fear for his life. Moreover, this Court has previously held the suppression of the prosecution's deal with Thomas to be prejudicial in Silva's case, notwithstanding *physical* evidence of the crime corroborating Thomas's story, fingerprint analysis placing Silva at the scene, and Silva's equivocating statements to the police post-arrest. *See Silva II*, 416 F.3d at 984. *See also* Order Denying Claim D, *Silva v. Woodford*, No. 2:90-cv-03311-DT (C.D. Cal. Dec. 22, 2003), ECF no. 200, at 9–15. There is similarly a reasonable probability that the jury would have in this case reached a different verdict had Thomas been thoroughly impeached, notwithstanding the fact that Shelton admitted being present for Thorpe's murder after having initially denied as much. In short, we reiterate, the suppression by the prosecution of its agreement with Thomas that he not obtain a mental examination prior to his testimony undermines confidence in the verdict.

The State argues that a statement that Shelton made to an investigator on February 1 demonstrates the veracity of Thomas's account of Thorpe's murder and rendered his testimony superfluous. According to an investigator's testimony, while Shelton was denying his presence at Thorpe's murder in that interview, he claimed that he was in the cabin at the time and that *Thomas* told *him* to turn up the stereo. At trial DePasquale argued that this made it "almost obvious that [Shelton is] putting Thomas in his position and what he's saying there is in essence an admission that he was trying to lay at Thomas' feet an admission that he went in there and he said turn up that stereo."

This disputed statement about the stereo is not, however, sufficient to give us confidence in the first-degree verdict. The case is riddled with inconsistencies regarding who did

what. Indeed, at one point, Thomas told the prosecution "that *he* was with Silva when Thorpe was killed." *Silva II*, 416 F.3d at 988 (emphasis added). Moreover, the investigator who testified to Shelton's statement about the stereo also testified that he "[didn't] remember exactly what [Shelton] told [him]."[14]

A comparison of the evidence against Shelton with respect to Craig's murder strongly supports our conclusion that he was prejudiced by the State's *Brady* violation. The jury heard evidence of premeditation and deliberation with respect to Craig's murder—Shelton's admission to the investigators that the men had discussed kidnapping and killing a girl prior to the crimes—yet it returned a verdict of only second-degree murder with respect to Shelton's role in her killing. The State concedes that this was because of the jury's "finding that there was insufficient evidence of deliberation or premeditation in killing Craig." Meanwhile, the only direct evidence that Shelton deliberated or premeditated the killing of Thorpe came from a witness whose vulnerability to charges of incompetency or insanity the State felt compelled to conceal. The other evidence that pertained to premeditation and deliberation applied equally, if not more strongly, to the murder of Craig as to that of Thorpe. It follows that if the jury had known about the prosecution's secret deal with Thomas, there is an even stronger probability than in Craig's case that it would have returned a verdict other than first-degree murder—that it

---

[14] At trial, Shelton maintained that the conversation about the stereo volume occurred several hours before Thorpe was taken up the hill and was unconnected to the killing, that he never said otherwise, and that the investigator either intentionally lied about what Shelton said regarding the stereo in the interview or mistakenly recounted an interview *with Thomas*.

would have found insufficient evidence to conclude beyond a reasonable doubt that Shelton premeditated and deliberated as to Thorpe's killing.[15]

We reject the State's contention that evidence of the prosecution's secret deal with Thomas would have been cumulative to the impeachment evidence presented to the jury. Thomas's accident and the fact that the prosecution had dropped murder charges against him in exchange for his cooperation were mentioned briefly during the trial. However, "the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather was of a different kind. It 'would have provided the defense with a new and different ground of impeachment.'" *Silva II*, 416 F.3d at 989 (quoting *Benn*, 283 F.3d at 1056). Evidence that murder charges had been dropped "could cast doubt only on Thomas's forthrightness, not his competence to testify," *id*. at 989, and the defense's argument that Thomas "does not have a good memory" was far less compelling than the suppressed evidence that the *prosecution* doubted his mental stability to the degree that it stopped him from being psychiatrically examined.

Finally, "[t]he prosecutor's own conduct in keeping the deal secret underscores the deal's importance." *Silva II*, 416 F.3d at 990. His "actions . . . speak as loud as his words. . . . The State's deliberate and strategic decision to

---

[15] Moreover, if the implausibility of Shelton's claims that Craig was there voluntarily, even after her boyfriend had been killed, did not persuade the jury to find him unworthy of belief and to reject his account of being surprised by her murder, there is no reason to think that the inconsistencies in his statements would have caused it to reach a verdict of first-degree murder with respect to Thorpe, either.

make the deal and not to disclose it suggests the weakness of its post hoc claims that the evidence was irrelevant." *Id.* If Thomas's testimony was unnecessary to Shelton's conviction as the State now claims, then there was no reason for it to take furtive actions to ensure that the jury never heard that both it and Thomas's lawyer believed that he might well be incompetent or insane. Indeed, the deal was premised on DePasquale's agreement with Gay that credible testimony by Thomas was necessary to obtaining a conviction of both Shelton and Silva.

## III.  Conclusion

In sum, the prosecution committed *Brady* error by concealing from the defense and the jury its deal precluding an examination of the mental competency of its star witness. We find this error prejudicial with respect to Shelton's first-degree murder conviction in part because Thomas was the only witness who provided direct evidence that Shelton deliberated and premeditated the murder of Thorpe, and in part because it is the prosecution's suppression of the powerful impeachment evidence that "'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Although we have serious doubts about the good-faith of the prosecution as a whole and find DePasquale's misconduct inexcusable, the extremely strong evidence in the record, aside from Thomas's testimony, regarding Shelton's commission of the other crimes precludes us from granting relief with respect to those convictions.[16] We leave those charges, which we address in the memorandum disposition filed concurrently with this opinion, undisturbed. The district court is directed to issue the

---

[16] Shelton does not challenge his convictions for weapons offenses.

writ ordering the State to retry Shelton for the murder of Thorpe within a reasonable time or to resentence him based on the remaining convictions.

**REVERSED IN PART, AFFIRMED IN PART, AND REMANDED FOR ISSUANCE OF A WRIT.**